UNITED STATES of America, Plaintiff-Appellee,

v.

Lucille JONES, Defendant-Appellant.

No. 74–1754.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1975.

Decided June 25, 1975.

Rehearing and Rehearing En Banc Denied July 18, 1975.

Sam Adam, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman and David A. McGuire, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The primary issues on this appeal are whether the district court erred in determining that there existed an adequate basis for the issuance of a search warrant and that the execution of that warrant and the items seized were proper.

## I

The defendant-appellant Lucille Jones was named together with Michael Thigpen in Counts I and VIII of an eleven-count indictment. Count I charged a conspiracy to possess and distribute heroin and cocaine in violation of 21 U.S.C. § 846 and Count VIII charged the use of a communication facility to facilitate the distribution of heroin and cocaine in violation of 21 U.S.C. § 843(b). Since the defendant makes a sufficiency of the evidence claim, we set out the evidence against the defendant in some detail.

On June 12, 1973, Special Agent Lester Scotti of the Drug Enforcement Administration (DEA) obtained pre-recorded government funds and along with a government informant went to the apartment of Michael Thigpen. After negotiating a price for cocaine, Thigpen left to go to his source and returned shortly thereafter and sold Agent Scotti approximately 9.74 grams of a substance containing cocaine for $450.

On June 27, 1973, Agent Scotti telephoned Thigpen at approximately 12:30 p. m. and discussed a possible purchase of an ounce of cocaine. Thigpen told Scotti he did not have an ounce, but that he could get it from his aunt. Approximately fifteen minutes later DEA agents observed Thigpen leave his apartment and go to Jones' residence. They observed that during this time Jones' car was parked nearby. Shortly thereafter Thigpen returned to his apartment where Agent Scotti was waiting for him and where Scotti paid Thigpen $1,150 in pre-recorded government funds in exchange for 25.73 grams of a substance containing cocaine.

On July 2, 1973, Thigpen told Agent Scotti over the telephone that his aunt had a quantity of heroin. The next day after Scotti complained that the price was too high Thigpen called his aunt and said, "Hello Lu, this is Michael, Scotti is here with me and he is hollering about the price. He wants to talk to you." Scotti then took the telephone and said, "Hello Lu, this is Scotti" to which the reply was "I know." After discussing possible future transactions on the telephone, Scotti told Thigpen to go over to his Aunt Lu's house and pick up an ounce of cocaine, and that he should call him from there to settle the price.

Thigpen left the apartment and was observed by two agents to enter the defendant's apartment at approximately 12:45 p. m. At approximately 1:00 p. m.

Agent Scotti received a telephone call from Thigpen who said he was at his aunt's house. Scotti, according to his testimony, talked with the same woman he had previously spoken with, and settled on a price. Agent Adams testified that at approximately 1:10 p. m. he observed the defendant on the second floor landing by her apartment, conversing with Thigpen. Shortly thereafter Thigpen returned to his apartment and in exchange for $2,500 in pre-recorded official advance funds gave to Agent Scotti approximately 28.39 grams of a substance containing cocaine and approximately 22.37 grams of a substance containing heroin.

Finally, on July 10, 1973, Agent Scotti went to Thigpen's apartment to make another purchase. At 1:20 p. m. Thigpen left the apartment. At 1:00 p. m. defendant Jones was observed leaving her home. A short while later Thigpen's and Jones' automobiles were observed parked together several blocks from Thigpen's residence. Thigpen returned to his apartment and then went out again supposedly to pick up the heroin and cocaine "from his wife." Upon returning for the second time Thigpen delivered four cellophane packets of narcotic substances, and was then placed under arrest by Agent Scotti.[1]

Scotti and other agents than proceeded to the home of defendant Jones, and in the company of Chicago police officers and pursuant to a state-issued warrant searched the premises. No narcotics were found, but the agents seized a piece of paper with the name and unlisted home telephone number of Agent Scotti in the handwriting of defendant Jones. Also seized was approximately $2,000 of United States currency, $800 of which was later found to be pre-recorded government funds which Scotti had used to purchase narcotics from Thigpen.[2]

1. Thigpen pleaded guilty to Counts I, VIII and IX of the indictment. On the government's motion the remaining counts against him were dismissed. Thigpen is not a party to this appeal.

2. Agents testified that at the time of the search Jones explained possession of the bills by stating that she had changed many small bills into larger bills at the grocery store. At her trial Jones claimed that $1,150 of the money seized were proceeds from the sale of a motorbike and the remainder came from Thigpen either as repayment of a loan or for her to hold for safekeeping.

In a bench trial the district judge, after denying defendant's motion to quash the warrant and to suppress the fruits of the search, found Jones guilty as charged and imposed a two-year sentence of imprisonment to be followed by a mandatory three-year parole term. Defendant appeals her conviction.

## II

Defendant in the court below argued that the issuance of the state warrant was improper. She alleged that the warrant was obtained through the perjured averments of the state officer. The officer stated in his affidavit that he had been told by a reliable informant that the defendant had sold him a packet of heroin. Defendant on appeal claims that, having filed an affidavit in support of her charge, she should have been accorded a hearing pursuant to *United States v. Carmichael*, 489 F.2d 983 (7th Cir. 1973).

The government contends that in fact a hearing was held and that defendant did not seek to prove the charges made in her affidavit. We have examined the record and it shows that after the defendant testified at the motion to suppress hearing the following occurred:

The Court: You may be excused. Call your next.

Mr. Levin [defense counsel]: Your Honor that concludes our presentation.

The Court: That concludes the evidentiary presentation in the motion to quash the search warrant?

Mr. Levin: Yes, it would, your Honor as far as the defendant is concerned.

A short while later, the following occurred:

The Court: . . . do you propose to put on evidence?

Mr. Burns [government counsel]: As to the motion to suppress?

The Court: Yes.

Mr. Burns: No, I do not think it is necessary. I can put Officer Brown on, but it is a question as to what is described on the face of the warrant and what was actually seized.

■ Thus, the defendant never called Officer Brown nor did it request the government do so even when the government indicated it was prepared to make him available. The fact that the defendant filed a verified affidavit alleging that perjurious material was used in gaining the warrant, does not replace the need for defense counsel to make demands at the appropriate time for the witnesses it desires. Given these circumstances, the district judge made a sufficient inquiry concerning the defendant's motion to quash the warrant and suppress evidence, and properly denied the motion.[3]

## III

Defendant next contends that federal agents could not conduct a search and subsequently seize materials from her premises on the authority of the state-issued search warrant.[4] She argues that federal agents engaged in this practice solely because they had insufficient evidence against her to obtain their own warrant.

■ The mere fact that federal agents accompanied state officers named in the warrant to the premises and participated in the search does not in and of itself require evidence seized to be suppressed. This is neither a case where evidence was seized pursuant to procedures that violated Illinois law and then sought to be used in federal court nor one where

3. With the exception of the claimed right to a hearing because of alleged perjured averments in gaining the warrant, defendant claims no variance with federal constitutional principles in the issuance of and execution of this warrant.

4. In actuality, federal agents seized only the piece of paper with Agent Scotti's name and

unlisted home telephone number on it. The money was seized by state officials on the advice of the federal agents and later, after being checked with the list of official funds used, was turned over to federal authorities.

the federal agents were looking for evidence of a crime substantially different from the one which state officials were concerned with and for which the warrant issued. Both the local police and federal agents legitimately searched for narcotics and narcotics paraphernalia, the possession or distribution of which violated the laws of each sovereign. The district judge was correct in refusing to grant the motion to suppress evidence on this ground. *See generally United States v. Harrington*, 504 F.2d 130 (7th Cir. 1974); *United States v. Sellers*, 483 F.2d 37 (5th Cir. 1973), *cert. denied*, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974); *Palmer v. United States*, 92 U.S. App.D.C. 103, 203 F.2d 66 (1953).

## IV

Defendant's final contention with regard to the search warrant is that the articles seized were not adequately described in the warrant and therefore the seizure exceeded the scope of the warrant and the articles should have been suppressed. The warrant authorized the seizure of "heroin, a controlled substance and all narcotic paraphernalia (hypodermic needles)."

The defendant has not argued that the scope of the search was too broad, but rather that the seizure was excessive. What this court said in *United States v. Zeidman*, 444 F.2d 1051 (7th Cir. 1971), is applicable to the present case.

> In the case before us we do not have a situation where the officers were going out of the area prescribed. . . A search warrant was regularly and properly issued and with specificity set forth the area to be searched. . . This was not a rummaging or general exploratory search. . . . While a search must be reasonable under the Fourth Amendment, there were no aspects of unreasonableness in the search presently involved. The narrow question we have here is when a lawful and reasonable search is involved, what objects may be validly seized.

*Id.* at 1054.

In answering the question of what articles may be seized the Supreme Court's holding in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), is instructive. After first deciding that the warrantless search involved and the scope of the search were permissible, the Court said:

> The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for "mere evidence" or for fruits, instrumentalities or contraband. There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.

*Id.* at 306–07, 87 S.Ct. at 1650.

In *United States v. Cook*, 432 F.2d 1093 (7th Cir. 1970), *cert. denied*, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971), a warrant had been issued to search the premises of one suspected of planting a bomb on a civilian aircraft. Although some items that would be used in preparing a bomb were listed on the warrant, a vise, which was not, was nonetheless allowed into evidence pursuant to broad language within the warrant, the court finding that the articles seized bore a reasonable relation to the purpose of the search. *Id.* 432 F.2d at 1105.

Similarly, in *United States v. Teller*, 412 F.2d 374 (7th Cir. 1969), *cert. denied*, 402 U.S. 949, 91 S.Ct. 1603, 29 L.Ed.2d 118 (1971), the warrant authorized the seizure of money in connection with a narcotics transaction. In executing the warrant, however, several index cards containing narcotics agents' license plate numbers were seized. The court held that an officer may seize items that were evidentiary, as well as fruits or instrumentalities of the crime being investigated pursuant to the warrant. *Id.* at 379.

In the present case it is clear that both local and federal law enforcement officials were investigating narcotics possession and distribution. As to the two pieces of evidence seized, we believe that they come within the designation of either fruits or instrumentalities of the crime or evidence reasonably connected to the alleged behavior being investigated.

■ Agent Scotti was present during the search and he along with the other federal agents knew that pre-recorded funds had been used for the purchase of narcotics from defendant's suspected co-conspirator. They had sufficient information to believe that the drugs purchased came from defendant's apartment (see Part I, *supra*) and that it would not be unreasonable to find pre-recorded funds there. Thus, when the officers found a substantial quantity of cash in large bills, they could reasonably believe that this was the fruit of criminal behavior, even though the actual identification of the pre-recorded funds did not occur until later.

■ Similarly, the slip of paper with Agent Scotti's name and unlisted home telephone number was in the nature of both an instrumentality of crime and evidence reasonably connected to the alleged criminal behavior under investigation. *United States .v. Teller, supra.*

For the foregoing reasons, we find no error in the district court's decision not to suppress the challenged evidence.

### V

■ Finally, the defendant raises a sufficiency of the evidence claim. We have reviewed the record carefully and since we have concluded that the motion to suppress was properly denied, we conclude that the facts outlined in Part I, *supra* are sufficient to sustain this conviction.

Affirmed.

SWYGERT, Circuit Judge (dissenting).

On July 10, 1973 a search warrant was issued by a judge of the Circuit Court of Cook County, Illinois. It was based on an affidavit executed by Bernard Brown, a police officer of the City of Chicago. The warrant described an apartment occupied by defendant-appellant Lucille Jones and authorized the search and seizure of "heroin, a controlled substance and all narcotic paraphernalia (hypodermic needles) which have been used in the commission of or which constitute evidence of Sec. 1402, Chapter 56½, Possession of Controlled Substances Heroin."

The warrant was executed on the day it was issued. A number of federal agents of the Drug Enforcement Administration accompanied the Chicago police on the search. No heroin or narcotic paraphernalia were found on defendant's person or in her apartment. During the search one of the federal agents, however, took from the defendant's purse a piece of paper on which appeared the agent's name and his unlisted home telephone number.

The agents asked the defendant to open a safe located in her bedroom. She complied, and officer Brown seized from the safe approximately $1900 in currency. At a later time, after seizure, the federal agents compared the serial number of these bills with the serial numbers of the marked money used in controlled purchases of cocaine from Thigpen and discovered that eight $100 bills had been given to Thigpen at the time of the purchases. The bills were turned over by the police to the federal agents. At defendant's trial the piece of paper and the $800 of marked money were offered and were admitted into evidence.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause . . . particularly describing the place to be searched, and the persons or things to be seized." The law is settled that the Amendment prohibits general searches. The Supreme Court made this clear in *Marron v. United States*, 275 U.S. 192, 195–96, 48 S.Ct. 74, 75, 72 L.Ed. 231 (1927), when it said: "General searches have long been deemed to violate fundamental rights. . . . The requirement that warrants

shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

Since the seized piece of paper and currency were not "particularly" described in the search warrant issued on application of police officer Brown, the seizure of these items was the result of a general search and therefore illegal unless justifiable on the basis of some exception to the warrant requirement. Though not explicitly stated by the majority, the search and seizure of these items are apparently being upheld on the plain view theory.

In my opinion the record does not support a finding that the name and telephone number were in "plain view." The plain view doctrine requires that an item be inadvertently found in the course of and within the scope of an otherwise permissible search. This "inadvertence" is an integral part of the doctrine. *Coolidge v. New Hampshire,* 403 U.S. 443, 471, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). An officer cannot use a warrant specifying one item as a license to search for other items which he suspects might be present.[1]

In this case it can be said that the piece of paper itself was found while the officers were within the scope of their search warrant. But there is no explanation of why the writing on the paper was read. True in this case it is a fine

line to draw, but there is an important privacy interest in the content of a person's private papers.[2] They should not be read during the course of a search unless there is a reason to do so that is related to the object of the legal search. Such was obviously the case in *Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), where the officers were searching for certain written documents. In our case the agents were searching for narcotics and narcotics paraphernalia. There is no explanation in the record about how the contents of the piece of paper could constitute narcotics or narcotics paraphernalia. Nor was there testimony by agent Scotti that he had inadvertently glanced at the paper and immediately recognized his name and phone number even assuming that such a statement could support a plain view theory. And certainly in this case where the federal agents were involved in an investigation of the defendant for a separate crime we cannot allow any type of presumption that agent Scotti had read the paper in the course of executing the search warrant rather than in an attempt to justify certain suspicions of other crimes.

Accordingly, the Government failed to meet its burden of proof on the plain view issue. The defendant had the burden of proving that the search and seizure of this paper were not accomplished pursuant to a valid warrant. That burden was met when it was shown that the piece of paper was not narcotics or narcotics paraphernalia and therefore not described in the warrant. The burden

---

1. In *Coolidge v. New Hampshire,* 403 U.S. 443, 470 n. 26, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971), Mr. Justice Stewart wrote:

    In *Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231, officers raided a speakeasy with a warrant to search for and seize contraband liquor. They arrested the bartender and seized a number of bills and other papers in plain view on the bar. While searching a closet for liquor they came across a ledger kept in the operation of the illegal business, which they also seized. There is no showing whatever that these seizures outside the warrant were planned in advance. . . . Thus *Marron*

. . . can hardly be cited for the proposition that the police may justify a planned warrantless seizure by maneuvering themselves within "plain view" of the object they want.

2. A clearer case would be presented if the paper seized and read had been a personal letter of some length, but the principle remains the same. Certainly there are few intrusions which lie closer to the historic core of the Fourth Amendment than the unauthorized reading of one's private papers.

then shifted to the Government to justify the search and seizure on the basis of some exception to the warrant requirement. It has attempted to do so on the basis of the plain view concept. But it has failed to prove all the essential elements of this exception. There is no proof that the contents of the piece of paper as distinguished from the piece of paper itself were inadvertently discovered in the course of a search properly limited to the items named in the search warrant. Given the nature of the objects of the search being conducted, it was incumbent upon the Government to offer such an explanation. The Government's failure to do so leaves us with a warrantless search of the contents of the paper that is not justified on the basis of any recognized exception to the warrant requirement. The search of the contents of this paper was a general search and the subsequent seizure was therefore unconstitutional.

Although I conclude that the seizure of the eight $100 bills was also unconstitutional and that the bills should have been suppressed, my reasoning is somewhat different from that with regard to the paper.

On a strictly plain view analysis the currency in the safe was apparently in plain sight when the safe was opened by the defendant at the request of the police who ostensibly wished to explore the contents of the safe for narcotics. This

inadvertent discovery, at least on the part of the police, did not automatically mean that the bills could then be seized.

While it is proper to seize inadvertently discovered "mere evidence" of a crime different from that which is the subject of the search, *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Constitution requires that at the time of discovery and seizure there be a strong probability that the item is evidence of a specific crime within the knowledge of the discovering officer. In regard to these bills there was an insufficient probability at the time of their discovery to support their seizure. When the bills were removed from the defendant's apartment, neither the police nor the federal agents knew whether any of them were the marked bills.[3] The federal agents may have suspected, independent of this search, that the defendant had engaged in criminal activity which involved $100 bills that had been marked. But the facts supporting that suspicion were insufficient to allow this type of warrantless seizure on the assumption that these bills might be part of the marked money.[4] The Government might argue that there was sufficient support for this assumption since the piece of paper containing agent Scotti's name and phone number had already been found. But this argument must fail in

3. A different issue might have arisen if the federal agents had brought along the list of numbers and checked the serial numbers of the bills upon their discovery. The issue then would be whether a lower standard of probability is needed to justify a further search in contrast to a seizure. But this would spawn a further issue: whether federal officers who accompany state officers in the execution of a state warrant particularly describing only "narcotics and narcotics paraphernalia" and who take with them means to "test" items not described in the warrant, have raised a *prima facie* case of "non-inadvertence" or misuse of the state warrant procedure. Since these issues are not before us, I do not think I should speculate on the answers.

4. It is interesting to note that the police seized and took possession of the currency found in the safe. Only after a comparison was made

by the federal agents of the bills with their list of marked money used in the Thigpen cocaine sales did the police turn over the eight $100 marked bills to the federal agents.

Thus an alternative rationale indicating that this warrantless seizure was unconstitutional can be constructed. Since the bills were not described in the warrant, their seizure by the police on the face of it was the result of a general search. Only after the federal agents discovered that eight of the bills were marked money did they "seize" without the benefit of a warrant the bills as evidence in the investigation of a federal offense. Thus it could be said that a second and perhaps "minor" unconstitutional intrusion on the privacy of the defendant occurred. For a somewhat analogous case *see United States v. Birrell*, 470 F.2d 113 (2d Cir. 1972).

my view since I believe the discovery of the name and number to have been unconstitutional. If, as the Government seems to contend, the seizure of the money was premised on the information gained from the paper, then the seizure of the money was fruit of the poisonous tree. I therefore do not even consider whether this additional information would support the seizure of these bills as evidence.

The Fourth Amendment speaks in terms of formality. When we ignore that formality and attempt to substitute the plain view doctrine when not applicable upon close analysis, we weaken the vitality of the Amendment which has for its purpose the prevention of arbitrary encroachments by the Government on the privacy of its citizens. The unsullied maintenance of that vitality is of paramount importance and must precede any so-called justice in a particular case.

I would reverse the conviction.